UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| WILLIAM COUSER and SUMMIT CARBON SOLUTIONS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>STORY COUNTY, IOWA; STORY COUNTY BOARD OF SUPERVISORS; LATIFAH FAISAL, in her official capacity as Story County Supervisor; LINDA MURKEN, in her official capacity as Story County Supervisor; LISA HEDDENS, in her official capacity as Story County Supervisor,<br><br>Defendants. | Civ. No. 4:22-cv-383<br><br>**COMPLAINT** |

## INTRODUCTION

1. This Court and the Eighth Circuit have repeatedly held that federal law preempts state and local government efforts to impose their own standards on federally regulated pipelines. *See ANR Pipeline Co. v. Iowa State Com. Comm'n*, 828 F.2d 465 (8th Cir. 1987); *Kinley Corp. v. Iowa Utils. Bd.*, 999 F.2d 354 (8th Cir. 1993); *cf. N. Nat. Gas Co. v. Iowa Utils. Bd.*, 377 F.3d 817 (8th Cir. 2004). Now, ignoring those rulings, Story County seeks to impose its own standards on an interstate pipeline project. But its effort is preempted, invalid, and unenforceable.

2. Plaintiffs William Couser and Summit Carbon Solutions, LLC ("Summit" for short) bring this action seeking declaratory and injunctive relief

against the enforcement of Story County's ordinance concerning pipeline permitting and safety. The ordinance violates and is preempted by Iowa Code Chapter 479B and regulations thereunder, the federal Pipeline Safety Act, and the Supremacy Clause of the U.S. Constitution because it impermissibly regulates permitting, location, and safety aspects of Summit's planned carbon dioxide pipeline.

## PARTIES

3.   Plaintiff William Couser is a lifelong citizen and resident of Story County, Iowa.

4.   Plaintiff Summit Carbon Solutions, LLC is a limited liability company organized under Delaware law with its principal place of business in Ames, Iowa. Summit Carbon Solutions, LLC is authorized and in good standing to transact business in Iowa.

5.   Defendant Story County, Iowa is a county and body corporate under the laws of Iowa.

6.   Defendant Story County Board of Supervisors is the board of supervisors and governing body for Story County under the laws of Iowa.

7.   Defendant Latifah Faisal is a supervisor on the Story County Board of Supervisors and is a resident of Iowa. Ms. Faisal is sued only in her official capacity as a Story County Supervisor.

8.   Defendant Linda Murken is a supervisor on the Story County Board of Supervisors and is a resident of Iowa. Ms. Murken is sued only in her official capacity as a Story County Supervisor.

9. Defendant Lisa Heddens is a supervisor on the Story County Board of Supervisors and is a resident of Iowa. Ms. Heddens is sued only in her official capacity as a Story County Supervisor.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over Count I under 28 U.S.C. § 1331 because Plaintiffs' claim arises under federal law, including the Supremacy Clause, U.S. Const. art. VI, cl. 2.

11. This Court has supplemental jurisdiction over Count II under 28 U.S.C. § 1367(a).

12. This Court is authorized to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 and Federal Rules of Civil Procedure 57 and 65.

13. Venue is proper in this Court under 28 U.S.C. § 1391(b) because all Defendants reside in this district and a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## FACTUAL ALLEGATIONS

**Corn, Ethanol, and Carbon Dioxide in Iowa**

14. Corn is one of Iowa's top commodities by volume and the State's most valuable agricultural commodity. Last year, Iowa produced corn worth more than $13.9 billion—which was $5.9 billion more than the State's next most valuable crop (soybeans).[1]

---

[1] *See 2021 State Agriculture Overview*, U.S. Dep't of Agric., https://www.nass.usda.gov/Quick_Stats/Ag_Overview/stateOverview.php?state=IOWA (last visited Nov. 9, 2022).

15. More than half of all corn harvested in Iowa goes to ethanol production. In fact, Iowa leads the nation in ethanol production with 57% of the corn grown in Iowa going to create nearly 27% of all American ethanol, more than any other state.[2] In 2019, for example, the State produced 2.58 billion bushels of corn, 1.5 billion of which were used in ethanol production.[3]

16. Corn's value in Iowa—and throughout the Nation—is inextricably tied to ethanol production.

17. Carbon dioxide ($CO_2$) is a byproduct of the fermentation process of producing ethanol from corn. $CO_2$ is not only a byproduct of ethanol plants but also a byproduct of numerous other manufacturing processes, including fertilizer ammonia production.

18. $CO_2$ is a greenhouse gas that poses environmental concerns if released into the atmosphere in large quantities.

19. Carbon capture and sequestration (CCS) is a process by which $CO_2$ is captured at the point of generation, transported, and then safely stored. CCS technology reduces greenhouse gas emissions by preventing the release of $CO_2$ into the atmosphere.

---

[2] *Corn Facts*, Iowa Corn Growers Ass'n, https://www.iowacorn.org/media-page/corn-facts#:~:text=Iowa%20leads%20the%20nation%20in,percent%20of%20all%20American%20ethanol (last visited Nov. 2, 2022) ("Iowa leads the nation in ethanol production, with 57 percent (1.5 billion bushels) of the corn grown in Iowa going to create nearly 27 percent of all American ethanol.").
[3] *See id.*

20. Carbon intensity measures the amount of carbon emitted per unit of energy consumed. Lower carbon emissions during fuel production result in a lower carbon intensity for that fuel.

21. The value of ethanol, and thus the price of corn, is affected by state and foreign regulations that target $CO_2$ emissions.

22. Canada, for example, is a primary importer of ethanol from the United States, and Iowa is one of the main sources of U.S. ethanol exports to Canada. In 2021, Canada imported approximately 1.3 billion liters of U.S. ethanol fuel—an 8% percent increase from 2020. Those imports are projected to reach a record 1.5 billion liters in 2022.[4]

23. Canada's increased demand for ethanol comes in part from recently enacted energy regulations that incentivize the production, sale, and use of low carbon intensity fuels. Canada's Clean Fuel Regulations (CFR), which became law in July 2022, imposes a comprehensive set of fuel standards, including requirements that fuel suppliers progressively reduce the carbon intensity of fuels sold in Canada. The CFR aims for a 15% decrease in the carbon intensity of gasoline and diesel used in Canada by 2030.[5]

---

[4] *See Canada: Biofuels Annual*, Report No. CA2022-0019, U.S. Dep't of Agric. (Aug. 22, 2022), https://apps.fas.usda.gov/newgainapi/api/Report/DownloadReportByFileName?fileName=Biofuels%20Annual_Ottawa_Canada_CA2022-0019.

[5] *See, e.g.*, *What are the Clean Fuel Regulations?*, Gov't of Canada, https://www.canada.ca/en/environment-climate-change/services/managing-pollution/energy-production/fuel-regulations/clean-fuel-regulations/about.html (last updated July 7, 2022); *Compliance with the Clean Fuel Regulations*, Gov't of Canada, https://www.canada.ca/en/environment-climate-change/services/managing-pollution/energy-production/fuel-regulations/clean-fuel-regulations/compliance.html (last updated July 20, 2022).

24. Energy regulations target carbon emissions in the United States too, increasing in-state demand for low carbon intensity fuels. California, for example, has adopted the Low Carbon Fuel Standard (LCFS), which requires ongoing reductions in the carbon intensity of fuels sold in the State.[6] The LCFS considers emissions associated with the complete life cycle of fuel—from production to transportation to consumption. Under the LCFS, providers of low carbon intensity fuels generate credits. The value of those credits for ethanol plants has historically varied from $50–$200 per ton of $CO_2$ depending on demand.[7] And the California Air Resources Board recognizes CCS as "an important strategy to reduce greenhouse gas (GHG) emissions and mitigate climate change."[8]

25. Oregon has adopted a similar approach.[9] Under its Clean Fuels Program, the State is targeting a 10% reduction in average carbon intensity from 2015 levels by 2025, a 20% percent reduction by 2030, and a 37% reduction by 2035.[10] Fuel providers and importers must show that the volume and fuel supplied meet annual standards. And businesses can generate credits for fuels that exceed those standards.

---

[6] *See, e.g.*, *Low Carbon Fuel Standard*, Cal. Air Res. Bd., https://ww2.arb.ca.gov/our-work/programs/low-carbon-fuel-standard (last visited Nov. 2, 2022).
[7] *See California Low Carbon Fuel Standard Credit Price*, Neste, https://www.neste.com/investors/market-data/lcfs-credit-price (last visited Nov. 2, 2022).
[8] *Carbon Capture & Sequestration*, Cal. Air Res. Bd., https://ww2.arb.ca.gov/our-work/programs/carbon-capture-sequestration (last visited Nov. 2, 2022).
[9] *See, e.g.*, *Clean Fuels Program Overview*, Oregon.gov, https://www.oregon.gov/deq/ghgp/cfp/Pages/CFP-Overview.aspx (last visited Nov. 2, 2022).
[10] *Clean Fuels Program Overview*, Oregon.gov, https://www.oregon.gov/deq/ghgp/cfp/Pages/CFP-Overview.aspx (last visited Nov. 2, 2022).

26. Other states have enacted similar low carbon initiatives and regulations.

27. The value of Iowa ethanol production, and the value of corn in Iowa—and throughout the Nation—depends on, and will likely increasingly depend on, carbon-reduction efforts of Iowa ethanol facilities.

**Summit's $CO_2$ Pipeline**

28. Summit is developing an interstate $CO_2$ pipeline and related facilities to facilitate CCS technology. When completed, the pipeline will transport $CO_2$ captured from more than 30 facilities (primarily ethanol plants but also some fertilizer plants) across South Dakota, North Dakota, Iowa, Minnesota, and Nebraska. The pipeline system will transport this $CO_2$ through a network of more than 1,900 miles of underground pipes across those five states and deliver it to geologically-appropriate sequestration sites in North Dakota.

29. In Iowa, the pipeline project is projected to involve more than 650 miles of pipeline, transporting $CO_2$ from both out-of-state and in-state facilities, including Lincolnway Energy in Nevada, Iowa.

30. The pipeline will travel through 30 counties in Iowa: Boone, Cerro Gordo, Cherokee, Chickasaw, Clay, Crawford, Dickinson, Emmet, Floyd, Franklin, Fremont, Greene, Hamilton, Hancock, Hardin, Ida, Kossuth, Lyon, Montgomery, O'Brien, Page, Palo Alto, Plymouth, Pottawattamie, Shelby, Sioux, Story, Webster, Woodbury, and Wright.

31.     The pipeline project is underway. Summit is in the process of surveying the routes for the project and securing the necessary permits. It is also negotiating with landowners for land access.

32.     In Iowa, Summit has been engaged with the Iowa Utilities Board (the "IUB") for more than a year as part of the planning and permitting for the pipeline project. In the fall of 2021, Summit held informational meetings facilitated by the IUB in all 30 counties included in the pipeline project. On January 28, 2022, Summit filed an extensive application with the IUB for the siting permit required for the pipeline under Iowa Law.[11] That application includes detailed legal descriptions and maps of the route, engineering information on the proposed project, details about the nature of the landforms being crossed, information about road and other types of crossings, and more.

33.     Additionally, and as is consistent with the IUB process, Summit has already obtained voluntary easements for nearly 60% of the proposed route in Iowa and has already paid millions of dollars to Iowa landowners.

34.     The pipeline project will help reduce the carbon footprint and environmental impact of ethanol production by facilitating the transportation and sequestration of $CO_2$, thereby reducing its release into the atmosphere, which in turn will reduce the carbon intensity of and enhance the long-term economic viability of Iowa's ethanol and agriculture industries.

---

[11] *See In re: Summit Carbon Solutions LLC*, Docket No. HLP-2021-0001 (Iowa Utils. Bd. Jan. 28, 2022), https://wcc.efs.iowa.gov/cs/idcplg?IdcService=GET_FILE&allowInterrupt=1&RevisionSelectionMethod=latest&dDocName=2082361&noSaveAs=1.

35. Ethanol plants whose $CO_2$ byproduct is transported through Summit's interstate pipeline—including Lincolnway Energy—will be equipped to produce carbon-neutral fuel by 2030 and will be better positioned to compete in energy markets that prefer or require fuels with low carbon intensity, including the Canada, California, and Oregon markets discussed above.

36. For example, through its use of Summit's pipeline, Lincolnway Energy could earn at least $15 million per year in low carbon premiums, which would be returned to its investors, almost all of which are Iowans.

37. Accordingly, Iowa ethanol plants—including Lincolnway Energy—have a direct interest and stake in the success of Summit's pipeline project.

38. Mr. Couser is also directly interested in the pipeline's success. He owns a 5,200-head feed lot, which is along the Summit pipeline route, as well as farms in Story County, Iowa. Mr. Couser and his son also own and rent farmland and frequently holds public tours on the land. The farm typically yields 200+ bushels of corn per acre. All of the corn grown on the Couser farms, with the exception of a small amount that is fed to his cattle, is sold to Lincolnway Energy for ethanol production and approximately 24–30 million bushels of corn from Story County is sold to Lincolnway Energy. In return, distiller's grains, a coproduct of the ethanol production, is brought back to the Couser feedlot for cattle feed.

39. Mr. Couser is also a founder of Lincolnway Energy, which operates its ethanol production facility in Story County, Iowa. Mr. Couser holds an ownership interest in the company.

40. Lincolnway Energy produces approximately 50 million gallons of ethanol per year. It has over 1,000 member units, the overwhelming majority of which are owned by Iowans.

41. Lincolnway Energy today does not ship any ethanol to California because its carbon intensity score is too high. With the pipeline, Lincolnway Energy would have a carbon intensity score that would allow it to ship its ethanol to California and Pacific Northwest markets. Because of the California and Oregon low carbon fuel standards and incentives, Lincolnway Energy has opportunities to sell its ethanol in those states at a premium if its ethanol meets the states' low carbon intensity standards.

42. Accordingly, Mr. Couser has a direct interest and stake in the success of Summit's pipeline project, both as a farmer and as a part-owner of an ethanol production facility. The pipeline project will help facilitate the viability and competitive edge of ethanol fuel production and increase that production. Increased ethanol production will bring higher demand and higher prices for corn, financially benefiting Mr. Couser and other corn farmers in the State. Moreover, the value of Mr. Couser's ownership interests in those ethanol facilities is inherently tied to the increased viability and volume of ethanol production that will result from Summit's pipeline project.

**Story County Ordinance No. 306**

43. Even though the federal government regulates the safety of Summit's pipeline project (as discussed below) and the IUB has the statutory authority to issue a route permit for the project upon a finding that it promotes the public necessity and

convenience, some Iowa counties have taken their own steps to regulate Summit's and others' pipeline projects, citing safety, zoning, and permitting concerns.

44. One of those counties is Story County. On October 25, 2022, the Story County Board of Supervisors passed Ordinance No. 306, which establishes setback and other requirements for hazardous materials pipelines in the county. A true and accurate copy of Ordinance No. 306 is attached as **Exhibit A**.

45. Ordinance No. 306 purports to establish new "standards" for "proposed hazardous materials pipelines" that are not "operated by public utilities" and are not "existing pipelines."

46. Story County's justification for the ordinance is based on alleged safety concerns.

47. For example, at the Story County Board of Supervisors meeting on October 18, 2022, Amelia Schoeneman, Planning and Development Director, explained the background and purpose of Ordinance No. 306. Ms. Schoeneman stated that Ordinance No. 306 "regulat[es] . . . hazardous materials pipelines that pose . . . **health and safety risks**"[12] explaining that the requirements were "based on **health and safety** concentration levels to ensure that there is adequate evacuation time."[13]

---

[12] Audio of Story Cnty. Bd. of Supervisors Meeting at 53:25 (Oct. 18, 2022), accessible at https://www.storycountyiowa.gov/Archive.aspx?AMID=54.
[13] *Id.* at 57:45.

11

48. In a memorandum to the Board of Supervisors, Ms. Schoeneman further stated that Ordinance No. 306 "is limited to setbacks and the setbacks are the minimum necessary **to protect public safety**."[14]

49. Ordinance No. 306 is injuring Plaintiffs by preventing Summit from completing—or even beginning—the portion of the pipeline project in Story County.

50. Ordinance No. 306 is specifically injuring Mr. Couser by preventing him from expanding his feedlot operations, which may not be accomplished in accordance with the setback requirements of the ordinance.

**The Pipeline Safety Act**

51. Although Story County, through its Board of Supervisors, seeks to regulate safety aspects of Summit's pipeline project, federal law already exclusively regulates interstate pipeline safety under the Pipeline Safety Act ("PSA"), 49 U.S.C. §§ 60101 *et seq*.

52. Congress enacted the PSA in 1994 "to revise, codify, and enact without substantive change," the Natural Gas Pipeline Safety Act of 1968 (NGPSA) and the Hazardous Liquids Pipeline Safety Act of 1979 (HLPSA). Pub. L. No. 103-272, 108 Stat. 745, preamble (1994). The PSA's purpose "is to provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities." 49 U.S.C. § 60102(a)(1).

---

[14] Ex. B, Memo Re: Ordinance 306, Amending Chapter 85, General Provisions and Definitions, and Chapter 86, District Requirements, of the Story County Code of Ordinances – Land Development Regulations to Establish Setback Requirements for Hazardous Materials Pipelines at 6 (Oct. 18, 2022), accessible at https://www.storycountyiowa.gov/AgendaCenter/ViewFile/Item/25503?fileID=19240 ("Memo Re: Ordinance No. 306).

53. Under the PSA, the U.S. Department of Transportation is charged with "prescrib[ing] minimum safety standards for pipeline transportation and for pipeline facilities." 49 U.S.C. § 60102(a)(2). The PSA also provides that DOT "shall regulate carbon dioxide transported by a hazardous liquid pipeline facility" and "shall prescribe standards related to hazardous liquid to ensure the safe transportation of carbon dioxide by such a facility." 49 U.S.C. § 60102(i)(1). DOT's regulatory authority, in turn, is delegated to the Pipeline and Hazardous Materials Safety Administration (PHMSA). *See* 49 U.S.C. § 108(a), (f).

54. $CO_2$ is a "hazardous liquid" under the PSA. *See* 49 U.S.C. § 60101(a)(4).

55. Because Summit is engaged in the interstate pipeline transportation of hazardous liquid and the construction, development, and operation of interstate hazardous liquid pipeline facilities, its project is subject to federal regulation under the PSA.

56. Under the PSA, "[a] State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c).

57. Through section 60104(c), the PSA "expressly preempts" any local government's "attempt to impose safety regulations" on interstate pipeline projects. *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 880 (9th Cir. 2006); *see also, e.g., id.* at 878 ("Federal preemption of the regulation of interstate pipeline safety in any other manner is manifest in the language of the PSA provision entitled 'Preemption.'"); *Kinley Corp.*, 999 F.2d at 359 ("Congress granted exclusive authority

[through the HLPSA] to regulate the safety of construction and operation of interstate hazardous liquid pipelines to the Secretary of the Department of Transportation. This Congressional grant of exclusive federal regulatory authority precludes state decision-making in this area altogether and leaves no regulatory room for the state to either establish its own safety standards or supplement the federal safety standards."); *ANR Pipeline Co.*, 828 F.2d at 470 ("Congress intended to preclude states from regulating in any manner whatsoever with respect to the safety of interstate transmission facilities. . . . [T]he NGPSA leaves nothing to the states in terms of substantive safety regulation of interstate pipelines, regardless of whether the local regulation is more restrictive, less restrictive, or identical to the federal standards.").

**Iowa Code § 479B**

58. Under Iowa Code § 479B, the IUB has broad authority over the permitting and siting of hazardous liquids pipelines.

59. The statute provides:

> It is the purpose of the general assembly in enacting this law to grant the utilities board the authority to implement certain controls over hazardous liquid pipelines to protect landowners and tenants from environmental or economic damages which may result from the construction, operation, or maintenance of a hazardous liquid pipeline or underground storage facility within the state, to approve the location and route of hazardous liquid pipelines, and to grant rights of eminent domain where necessary.

Iowa Code § 479B.1.

60. It is squarely within the IUB's province to "grant a permit in whole or in part upon terms, conditions, and restrictions as to location and route as it determines to be just and proper." Iowa Code § 479B.9.

61. Under this delegation of authority, the IUB has developed extensive and detailed rules and requirements applicable to the permitting of hazardous liquids pipelines. *See, e.g.*, Iowa Admin. Code 199-9, 199-13.

62. Iowa Code Chapter 479B and the IUB's regulations preempt Story County's separate permitting processes that would require Summit to meet additional requirements beyond what the state law permitting process requires. *See, e.g.*, *Goodell v. Humboldt County*, 575 N.W.2d 486, 503 (Iowa 1998).

## COUNT I
**(Supremacy Clause Preemption)**

63. Plaintiffs reallege and incorporate by reference all allegations in the Complaint.

64. Under the Supremacy Clause, "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. As a result, state and local laws, ordinances, and other regulations that conflict with federal law are "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).

65. The purpose of Story County's Ordinance No. 306 is to address safety aspects of hazardous liquid pipelines, including Summit's pipeline project.

66. As such, Story County's ordinance constitutes a "safety standard[] for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c).

67. Ordinance No. 306 is designed and serves to supplement and supplant the methods of regulating pipeline safety that Congress has established and delegated to DOT and PHMSA.

68. Ordinance No. 306 purports to regulate within a field so pervasively occupied by federal law that any state or local regulation is precluded and excluded.

69. Ordinance No. 306 violates the PSA, conflicts with the PSA, and stands as an obstacle to accomplishing Congress's full purposes and objectives.

70. The PSA therefore preempts Ordinance No. 306—by express, field, and conflict preemption—rendering it invalid, unenforceable, and null and void.

## COUNT II
**(Iowa Statutory Preemption)**

71. Plaintiffs reallege and incorporate by reference all allegations in the Complaint.

72. Under the Iowa Constitution, "a county's exercise of home rule power cannot be 'inconsistent with the laws of the general assembly.'" *Goodell*, 575 N.W.2d at 500 (quoting Iowa Const. art. III, § 39A). Indeed, "the constitutional grant of home rule power is carefully qualified so as to withhold the grant of power where it conflicts with [a] state statute." *Id.* (citation and quotation marks omitted); *see also Mall Real Est., L.L.C. v. City of Hamburg*, 818 N.W.2d 190, 195 (Iowa 2012) ("[L]egislative

power trumps the power of local authorities when the legislature exercises its power." (citation and quotation marks omitted)).

73. Under Iowa law, then, local regulations and ordinances that conflict with or are irreconcilable with state law are preempted and invalid. *See Goodell*, 575 N.W.2d at 500–01; *Mall Real Est.*, 818 N.W.2d at 196; *Worth Cnty. Friends of Agric. v. Worth County*, 688 N.W.2d 257, 262 (Iowa 2004). When a "local ordinance would prohibit an activity absent compliance with the additional requirements of local law, even though under state law the activity would be permitted because it complied with the requirements of state law," then the regulation is "inconsistent with state law and preempted." *Goodell*, 575 N.W.2d at 501.

74. Iowa state law grants the IUB "the authority to implement certain controls over hazardous liquid pipelines to protect landowners and tenants from environmental or economic damages which may result from the construction, operation, or maintenance of a hazardous liquid pipeline or underground storage facility within the state, [and] to approve the location and route of hazardous liquid pipelines." Iowa Code § 479B.1.

75. Ordinance No. 306 purports to impose an additional permitting process on hazardous liquids pipelines, separate and apart from the standards established by the IUB. Under Ordinance No. 306, Summit must meet all siting and other requirements imposed by Story County in addition to those required by the IUB.

76. As such, Ordinance No. 306 is designed and serves to supplement and supplant the methods of regulating pipeline activities that the State of Iowa has established and delegated to the IUB.

77. Ordinance No. 306 purports to regulate within a field that the Iowa legislature has so pervasively covered that any county regulation is precluded and excluded.

78. Ordinance No. 306 is irreconcilable with Iowa state law because it prohibits activity otherwise permitted under state law "absent compliance with the additional requirements of local law." *Goodell*, 575 N.W.2d at 501.

79. Ordinance No. 306 violates the Iowa statute, conflicts with the Iowa statute, and stands as an obstacle to accomplishing the State of Iowa's full purposes and objectives.

80. The Iowa statutory scheme established by Chapter 479B therefore preempts Ordinance No. 306—by express, field, and conflict preemption—rendering it invalid, unenforceable, and null and void.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court grant the following relief:

1. Under 28 U.S.C. §§ 2201 and 2022 and Federal Rule of Civil Procedure 57, declare that Ordinance No. 306 is preempted by the Pipeline Safety Act and is invalid, unenforceable, and null and void as applied to Summit's pipeline project;

2. Under 28 U.S.C. §§ 2201 and 2022 and Federal Rule of Civil Procedure 57, declare that Ordinance No. 306 is preempted by Iowa state law and is invalid, unenforceable, and null and void as applied to Summit's pipeline project;

18

3. Under Federal Rule of Civil Procedure 65, preliminarily and permanently enjoin Story County from (i) enforcing or implementing Ordinance No. 306, (ii) enforcing or implementing any other ordinances on the permitting, construction, or development of Summit's pipeline project, and (iii) enforcing or implementing any resolution, ordinance, moratorium, ban, or other regulation that purports or intends to regulate any safety or permitting aspect of Summit's pipeline project;

4. Award Plaintiffs their costs under Federal Rule of Civil Procedure 54 and any other applicable authority; and

5. Award such other and further relief as the Court deems appropriate.

DATED, this 14th day of November, 2022.

**FREDRIKSON & BYRON, P.A.**

BY:  */s/ Bret A. Dublinske*
BRET A. DUBLINSKE, AT0002232
BRANT M. LEONARD, AT0010157
KRISTY DAHL ROGERS, AT0012773
111 East Grand Ave.
Suite 301
Des Moines, IA 50309
(515) 242-8900
BDublinske@fredlaw.com
bleonard@fredlaw.com
krogers@fredlaw.com

BRIAN D. BOONE
(*pro hac vice forthcoming*)
MICHAEL R. HOERNLEIN
(*pro hac vice forthcoming*)
**ALSTON & BIRD LLP**
101 S. Tyron St., Ste. 4000
Charlotte, NC 28280
(704) 444-1000
brian.boone@alston.com
michael.hoernlein@alston.com

KARLA M. DOE
(*pro hac vice forthcoming*)
**ALSTON & BIRD LLP**
1201 West Peachtree Street
Atlanta, GA 30309
(404) 881-7000
karla.doe@alston.com

*Counsel for Plaintiffs*